UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PNC BANK NATIONAL
ASSOCIATION,

                Plaintiff,

v.

MB WHOLESALE, INC. and ABED
MEHANNA,

                Defendants.

_____/

Case No. 17-11295

Paul D. Borman
United States District Judge

David R. Grand
United States Magistrate Judge

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff PNC Bank, N.A. filed this lawsuit to enforce three contracts: a promissory note representing a $1.1 million loan to Defendant MB Wholesale, Inc., a personal guarantee of the loan signed by Defendant Abed Mehanna (MB Wholesale's owner), and a security agreement purportedly granting Plaintiff a security interest in all of MB Wholesale's assets.

Defendants do not contest that they signed the loan agreement and the guarantee. Plaintiff now moves for summary judgment on that basis,[1] and

---

[1] In addition to claims for breach of the loan agreement and breach of the guaranty, Plaintiff's Complaint included a third count ("Claim and Delivery") seeking various forms of relief in connection with the security agreement, including an order requiring Defendants to show cause why the collateral under the security agreement should not be delivered, an order that Defendants deliver the collateral to Plaintiff, an order authorizing Plaintiff to dispose of the collateral, a determination of the

Defendants raise two arguments in opposition. First, they argue that Plaintiff cannot prove damages, because the officer who signed the affidavit evidencing those damages gave deposition testimony suggesting a lack of personal knowledge as to how they were calculated. Second, they argue that the loan documents are unconscionable under Michigan law. Neither argument has merit, and Plaintiff is entitled to summary judgment as to Defendants' liability under the loan agreement and the guarantee.

## I. BACKGROUND

### A. Factual Background

#### 1. The parties

Plaintiff PNC Bank, N.A. ("**PNC**" or "**Plaintiff**") is a national bank chartered under the laws of the United States, with its home office in Delaware. (ECF No. 1, Compl. ¶ 1.) Defendant MB Wholesale, Inc. ("**MB Wholesale**") is a warehousing company incorporated under Michigan law, whose principal place of business is in Michigan. (ECF No. 9, Answer ¶ 2.) Defendant Abed Mehanna owns MB Wholesale, and is domiciled in Michigan. (*Id.* ¶ 3; Defs.' Resp. Ex. at 1, Pg ID 272.)

---

priority of Plaintiff's security interest, and other remedies. (ECF No. 1, Compl. at 7-9, Pg ID 7-9.) In its summary judgment briefing, however, Plaintiff has offered no evidence or made any particular argument supporting its entitlement to summary judgment on Count III. The Court therefore construes Plaintiff's motion as a Motion for Partial Summary Judgment directed at Counts I and II of the Complaint only.

### 2. Documents related to the loan

#### i. Loan Agreement

On December 30, 2015, Plaintiff entered into a Loan Agreement with MB Wholesale. (ECF No. 16, Pl.'s Mot. Ex. 1, Loan Agreement.) In the Loan Agreement, Plaintiff agreed to extend a "committed revolving line of credit" to MB Wholesale, from which Plaintiff agreed to "make advances to the Borrower from time to time until the Expiration Date, in an aggregate amount outstanding at any time not to exceed $1,100,000.00." (*Id.* at 1, Pg ID 220.) The "Expiration Date" under the Loan Agreement was December 30, 2016. (*Id.*)

Above the signature lines on the Loan Agreement was the following language: "The Borrower acknowledges that it has read and understood all the provisions of this Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate." (*Id.* at 11, Pg ID 230.)

#### ii. Committed Line of Credit Note

The parties also executed a Committed Line of Credit Note ("**Note**") on December 30, 2015. (Pl.'s Mot. Ex. 2, Note.) In the Note, MB Wholesale agreed to pay Plaintiff $1,100,000 "or such lesser amount as may be advanced to or for the benefit of the Borrower hereunder, together with interest accruing on the outstanding principal balance" from the date of the Note's execution. (*Id.* at 1, Pg ID 233.) As to the interest rate, the Note provided that "[a]mounts outstanding under this Note will

bear interest at a rate per annum which is at all times equal to (A) the Daily LIBOR[2] Rate <u>plus</u> (B) two hundred seventy-five (275) basis points (2.75%)." (*Id.* (emphasis in original).) Any outstanding principal and accrued interest was due and payable on the "Expiration Date," which was December 30, 2016. (*Id.* at 1-2, Pg ID 233-34.)

Above the signature lines on the Note was the following language: "The Borrower acknowledges that it has read and understood all the provisions of this Note, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate." (*Id.* at 7, Pg ID 239.)

### iii.    Security Agreement and UCC Financing Statement

Repayment of Defendants' obligation was secured by a security interest in MB Wholesale's personal property, granted pursuant to a Security Agreement executed December 30, 2015. (Pl.'s Mot. Ex. 4, Security Agreement.) The Security Agreement defined the "Collateral" as "all personal property of the Grantor [i.e., MB Wholesale], . . . whether now owned or hereafter acquired or arising and wherever located," and set forth a list of categories of such property, ranging from securities and deposit accounts to inventory to equipment to "general intangibles." (*Id.* at 1, Pg ID 243.) Above the signature lines on the Security Agreement was the

---

[2] "The London InterBank Offered Rate (LIBOR) is a benchmark interest rate disseminated by the British Bankers' Association based on the rate at which certain banks predict they can borrow funds. LIBOR is a reference point in determining interest rates for financial instruments in the United States and globally." *Gelboim v. Bank of Am. Corp.*, 135 S. Ct. 897, 903 (2015).

following language: "The Grantor acknowledges that it has read and understood all the provisions of this Agreement, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate." (*Id.* at 7, Pg ID 249.) A UCC Financing Statement covering the same collateral was filed with the Michigan Secretary of State on January 25, 2016. (Pl.'s Mot. Ex. 5.)

### iv.    Guaranty

Contemporaneously with the Loan Agreement, the Note, and the Security Agreement, Mehanna executed a Guaranty and Suretyship Agreement ("**Guaranty**"), under which Mehanna agreed to personally guarantee repayment of MB Wholesale's obligations to Plaintiff under the Note or otherwise. (Pl.'s Mot. Ex. 6, Guaranty.) In the Guaranty, which defined Plaintiff as "the Bank" and MB Wholesale as "Borrower," Mehanna "unconditionally guarantee[d] . . . (i) the prompt payment and performance of the Obligations and (ii) the prompt payment of all costs and expenses of the Bank (including reasonable attorneys' fees and expenses) incurred in the documentation, negotiation, modification, enforcement, collection and otherwise in connection with the Obligations." (*Id.* at 1, Pg ID 258.) The Guaranty then defined "the Obligations" broadly to include "all loans, advances, debts, liabilities, obligations, covenants and duties owing by the Borrower to the Bank or to any other direct or indirect subsidiary of The PNC Financial Services Group, Inc., of any kind or nature, present or future," whether "evidenced by any

note, guaranty or other instrument" or not, and whether "arising under any agreement, instrument or document" or not. (*Id.*)

Above the signature lines on the Guaranty was the following language: "The Guarantor acknowledges that it has read and understood all the provisions of this Guaranty, including the waiver of jury trial, and has been advised by counsel as necessary or appropriate." (*Id.* at 6, Pg ID 263.)

### 3. Circumstances surrounding the loan

As of 2015, MB Wholesale was in substantial debt, and Mehanna avers in an affidavit that he "would not have been able to continue operating MB without PNC's loan and . . . had no alternative sources for funding or ability to pay off MB's debts." (Defs.' Resp. Ex. 3, Affidavit of Abed Mehanna ¶ 8.) By Mehanna's account, he met with a PNC representative on December 30, 2015 to sign the loan and guaranty documents. (*Id.* ¶ 3.) Mehanna avers that he had never seen the documents before, that the meeting lasted between 30 and 60 minutes, and that he did not have time to read the loan documents at the meeting. (*Id.* ¶ 4-5.) Mehanna was, he avers, "under the impression that the terms of the Loan Documents were non-negotiable," and therefore that he "could either take them or leave them." (*Id.* ¶ 6.)

Gregory Eichbrecht, the PNC employee who met with Mehanna, was deposed on October 25, 2017. (Defs.' Resp. Ex. 4, Deposition of Gregory Eichbrecht.) At the relevant time, Eichbrecht was a "[r]elationship manager" for Plaintiff, and his

responsibilities as such included "[b]usiness development, bringing in new clients, servicing new clients on all aspects, work[ing] with our product partners and then provid[ing] customer service . . . to our clients." (Eichbrecht Dep. 9:1-15.) Eichbrecht had worked with Mehanna to arrange the "terms of the closing," and estimated that he had had "four or five" in-person meetings and "at least a dozen phone calls" with Mehanna. (Eichbrecht Dep. 11:9-21.) Eichbrecht testified that Mehanna signed a series of documents at the closing, including the Loan Agreement, Note, Security Agreement, and Guaranty discussed above. (Eichbrecht Dep. 13:9-15:4.) Mehanna also signed three other documents at the closing: a set of Resolutions for Extensions of Credit And Incumbency Certificate; a Delegation and Email Authorization Letter; and a Working Cash, Line of Credit, Investment Sweep Rider that was incorporated into the Note. (Eichbrecht Dep. 12:3-13:5, 15:8-18.)

Eichbrecht testified that his usual practice was to email or otherwise provide loan documents to clients for their review before closings, but he could not recall whether he did so with Mehanna. (Eichbrecht Dep. 15:19-16:3.) He also testified that he did not believe Mehanna went through the documents "word by word" at the closing, and could not remember whether Mehanna asked any questions about them. (Eichbrecht Dep. 16:4-19.) Eichbrecht further testified that per his common practice, clients would review terms of loans both at and prior to closings:

[A.] Typically, I go through the documents, explain what each of them—what the document is, but even before the documents are provided, we go over what was approved in the structure.

Q. What do you mean by that?

A. Well, when we put it in with the financial statements that we were provided and the background checks, whatever the underwriters do, we will look at an approval for a certain structure and then we go over it with our clients to see if it's satisfactory with them.

Q. And by "certain structure," what kind of things do you mean?

A. Terms of the loan, you know, whether it's one year or multiple years, repayment of the terms, guaranties, covenants, collateral, borrowing basis.

(Eichbrecht Dep. 16:20-17:10.) Eichbrecht also testified about what he generally discussed with clients regarding documents like the Note in this case:

[Q.] What would you typically talk to a client about at a closing related to the committed line of credit note?

A. Typically at closing, just more or less the review, because like I said, they typically have the documents prior to. I let them know, just like we discussed in this particular situation, the -- it's a $1.1 million line of credit where there is no borrowing base, and that our interest rate is LIBOR plus 275, and then I always make mention, because I don't like surprises, I refer to number 17, talk about fees and that there is an annual fee that is also associated with this particular loan as well.

Q. Anything else that you typically inform a borrower of?

A. Not really, only if they have questions.

Q. Do you recall if Mr. Mehanna had any questions?

A. I don't recall.

(Eichbrecht Dep. 27:13-28:4.)

Lastly, Eichbrecht testified that Mehanna did not have an attorney with him at the closing, and he had no evidence that Mehanna was represented by an attorney

in connection with the transaction at all. (Eichbrecht Dep. 34:18-35:3.)

### 4. Default and deficiency calculations

The loan originally had a one-year term, with a maturity date of December 30, 2016. (Loan Agreement at 1, Pg ID 220; Note at 1, Pg ID 233.) In a letter to both Defendants dated February 3, 2017, Plaintiff indicated that "the Line of Credit has been temporarily extended pending further credit review and approval." (Pl.'s Mot. Ex. 3, Notice.) The expiration date, Plaintiff advised, was "extended from January 29, 2017 to March 30, 2017, or such later date as may, in the Bank's sole discretion, be designated by the Bank by written notice from the Bank to the Borrower, effective on January 30, 2017." (*Id.*) The record does not reflect when or how the expiration date was extended from December 30, 2016 to January 29, 2017.

On April 3, 2017, Plaintiff sent a letter to Defendants with the subject line "Demand for Payment." (Defs.' Resp. Ex. 8, Deposition of Joan Wane Ex. 13, April 3, 2016 Letter, Pg ID 502-04.) In it, Plaintiff advised that the loan was "in default due to the Borrower's failure to pay the outstanding balance on the expiration date of March 30, 2017." (*Id.* at Pg ID 502.) Exhibit A to the letter set forth the amounts owing: $1,095,824.05 in principal, $456.13 in accrued interest, $42.97 in late charges, and $1,375 in "Loan Administration," making for a total of $1,097,698.15. (*Id.* at Pg ID 504.) The letter stated that "the Borrower is also required to pay all of the Bank's attorneys' fees, collection costs, a pre-payment fee, if provided for in the

Note, and all interest and late charges which subsequently accrue in accordance with the terms of the Note and the other applicable loan documentation." (*Id.* at Pg ID 502.) The letter demanded payment on or before April 17, 2017. (*Id.*)

The April 3, 2017 letter was signed by Joan Wane. (*Id.*) An affidavit sworn to by Wane is attached to Plaintiff's Motion. (Pl.'s Mot. Ex. 7, Affidavit of Joan Wane.) In it, Wane averred as follows:

> 1. I am a Vice President of PNC BANK National Association (the "Bank").
> 2. I am involved as a Senior Asset Manager of PNC's Asset Resolution Team with the administration of the Bank's loan relationship with the Defendants, MB Wholesale, Inc. and Abed Mehanna (collectively, the "Defendants").
> 3. I am familiar with the Bank's books and records pertaining to its loan relationship with the Defendants, and if called to testify as to the facts contained in this Affidavit, can do so from my personal knowledge and from my knowledge of the Bank's business records.
> 4. MB Wholesale, Inc. has failed to pay the outstanding indebtedness in full at maturity as required pursuant to the Note.
> 5. Abed Mehanna has failed to pay all outstanding amounts owed by MB Wholesale, Inc. pursuant to the terms of his Guaranty.
> 6. As of November 17, 2017, the total amount of $1,143,519.71 is due and owing to the Bank, comprised of the principal balance of $1,095,824.05, accrued interest of $33,117.69, and late charges of $842.97 and legal fees of $13,735.00. Interest continues to accrue on the outstanding balance owed in the amount of $122.75 per day.

(Wane Aff. ¶¶ 2-6.)

During discovery, Defendants requested that Plaintiff produce "all Documents related to the calculation of the amounts You claim in paragraph 18 of the Complaint

are due under the Line of Credit,"[3] in response to which Plaintiff produced a payment history record entitled "Loan Reamortization File Request" and dated June 6, 2017. (Wane Dep. Ex. 9, Plaintiff's Answer to Defendants' First Set of Discovery Requests to Plaintiff ¶ 10, Pg ID 479; Wane Dep. Ex. 10, Payment History.) The entries in the Payment History range from December 31, 2015 to June 8, 2017, and they include items such as principal advances, interest rate changes, interest accruals, and interest payments. In the column "Principal Balance," there is a number for each line apparently reflecting the principal balance on the loan on any given day. (Payment History at Pg ID 482.) The column "Interest Accrual" contains positive numbers that appear to reflect daily additions to the interest on the loan; the column "Interest Payment" contains both positive and negative numbers, apparently reflecting interest payments and interest payment reversals respectively. (*Id.*) There are also columns entitled "Principal Due" and "Interest Due," the entries in which would presumably reflect the principal and interest amounts due on any given date, but the only entries that appear in those columns are on January 29, 2017 and March 30, 2017—that is, on or around the extended expiration dates when the loan came due.

_____

[3] The amounts set forth in Paragraph 18 of the Complaint in this action are less than the amounts set forth in Wane's Affidavit as quoted above, presumably because they were the amounts owed as of April 24, 2017, when the Complaint was filed, while Wane's Affidavit states the amount owed as of November 17, 2017. The Complaint alleges the same principal as the Wane Affidavit ($1,095,824.05), but the interest is $2,847.25, late fees are $142.97, and there are no legal fees alleged, so the total is $1,098,814.27. (Compl. ¶ 18.)

The Payment History has several irregularities. It is more or less uniform, reflecting frequent interest rate changes and interest accruals, as well as occasional principal advances and interest payments, for the first 11 pages. (*See id.* at 482-92.) But starting on page 12, from February 22, 2017, the Payment History becomes noticeably less detailed, and contains mostly interest rate changes (but without the corresponding numbers that had previously accompanied such entries), with three interest payments and then immediate reversals of those interest payments interspersed throughout. Pages 12 and 13 continue in that fashion until June 8, 2017, which is the date on which the Payment History was generated. (*See id.* at Pg ID 493-94.) Then, on page 14, the Payment History appears to start over with a new title and column headings, and continues from February 21, 2017, containing the same level of detail that the document showed before pages 12 and 13, and ending on June 8, 2017. (*See id.* at Pg ID 495-98.) The heading on page 14 of the document shows that it was retrieved separately from the first 13 pages, on the same date but 13 seconds later. (*See id.* at Pg ID 482, 495.)

In addition, there are two separate "final" calculations on the Payment History. On page 13, after the record becomes less detailed and then proceeds to June 8 as described above, there is a calculation entitled "Interest Owing," which indicates "ITD [i.e., Interest to Date] Charged" as $36,394.93, "ITD Paid" as the same amount, and no amount next to "Payoff." (*Id.* at Pg ID 494.) Then, after the

Payment History resumes again from February 21, 2017, there is a similar "Interest Owing" calculation that has different amounts: the "ITD Charged" is $17,595.51, the "ITD Paid" is $4100.49, and the "Payoff" is $13,495.02, which is the difference between the first two figures. (*Id.* at Pg ID 498.)

Joan Wane was deposed as Plaintiff's Rule 30(b)(6) representative[4] on October 25, 2017. There, she was questioned about the irregularities in the Payment History, and was unable to explain them. For example, regarding the first of the two "Interest Owing" calculations on page 13 of the Payment History—which specified the same amount as "ITD Charged" and "ITD Paid"—Wane testified as follows:

> Q. It looks to me as if as of June 8th, 2017, according to at least this part of the document, the amount of the interest charged was also paid. Is that your conclusion as well?
> A. No.
> Q. Why not?
> A. Because I'm not sure I understand what codes they may be using for this.
> Q. So you don't understand this entry at all?

---

[4] Wane was deposed pursuant to Federal Rule of Civil Procedure 30(b)(6), which relevantly provides that

> a party may name as the deponent a public or private corporation, a partnership, an association, a governmental agency, or other entity and must describe with reasonable particularity the matters for examination. The named organization must then designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and it may set out the matters on which each person designated will testify. A subpoena must advise a nonparty organization of its duty to make this designation. The persons designated must testify about information known or reasonably available to the organization.

A. No.

(Wane Dep. 43:3-12.)

Asked why the second, more detailed part of the Payment History included entries that the first part did not, Wane testified "I have no idea. I did not prepare this printout." (Wane Dep. 47:17-22.) She then testified regarding the more detailed part of the Payment history as follows:

> Q. [I]t has different information . . . than the previous chart, doesn't it?
> A. Different in what regard?
> Q. Different interest accruals, for example?
> A. That they are showing on one page, but not on the other? Is that what you're saying? The one page is a blank and the other page is actually printed out? It may be the way the report was printed out.
>  . . .
> Q. . . . [F]or example, on March 1st, 2017, the first time that date is mentioned, there is a rate change and nothing else, and the same for March 2nd and the same for March 3rd and the same for March 6th and the same for March 7th and the same for March 8th. Do you see that?
> A. I do.
> Q. And there are no interest accruals on those dates, correct?
> A. Correct.
> Q. But then the second time, if you go through, there's lots of interest accruals. There is one on March 2nd. There's one on March 3rd. There is one on March 6th. There is one on March 7th. Do you see that?
> A. Uh-huh.
> Q. Okay. I'm asking you, why is that?
> A. It may be because when the report was run, maybe it didn't -- maybe it didn't print all the information, so they had to rerun it again. I don't know. Maybe it didn't print correctly. I don't know.
> Q. You don't have any idea?
> A. I have no idea.

(Wane Dep. 50:21-52:4.)

More generally, Wane testified that she obtained the amounts stated in her Affidavit as follows: "I requested a payoff through my assistant, who requested payoff from that area of the bank that calculates payoffs, and it was sent to me broken down as principal, interest, late charges and fees and the per diem at that time." (Wane Dep. 62:24-63:3.) She did not know who in the payoff department supplied her assistant with the figures, nor how that person obtained them. (Wane Dep. 63:11-19.) She testified that besides adding up the final totals in the breakdown she received from the payoff department to make sure they were internally consistent, she did not independently check any calculations, and that she relied as a general matter on company records like the Payment History because she had no reason to assume that such records were inaccurate. (Wane Dep. 34:1-10, 69:3-70:4, 87:8-21.)

## B. Procedural History

Plaintiff filed suit on April 25, 2017, invoking this Court's diversity jurisdiction. (ECF No. 1, Compl.; *see id.* ¶ 4 (citing 28 U.S.C. § 1332(a)).) The Complaint asserts three claims: Breach of Line of Credit against MB Wholesale (Count I), Breach of Guaranty against Mehanna (Count II), and Claim and Delivery against MB Wholesale (Count III).

Both Defendants answered the Complaint on June 2, 2017. (ECF No. 9, Answer.) In their Answer, Defendants admitted that MB Wholesale "executed a

15

promissory note to PNC in the original [principal] amount of $1,100,000," and that Mehanna "executed a guaranty in favor of PNC." (*Id.* ¶¶ 7, 9.) Defendants also admitted that "Plaintiff has made a demand," and that Defendants "have not paid the amount demanded." (*Id.* ¶¶ 11, 13; *see also id.* ¶¶ 12, 16, 17, 21, 23, 27.) Defendants neither admitted nor denied Plaintiff's allegations as regards the Security Agreement, stating in their Answer that they "lack sufficient knowledge or information to form a belief as to the truth of these allegations, and leave the Plaintiff to its proofs." (*Id.* ¶ 8.)

Plaintiff filed the instant Motion for Partial Summary Judgment on November 21, 2017. (ECF No. 16, Pl.'s Mot.) Defendants filed a belated Response on January 21, 2018, which at its core consisted of two arguments: that Plaintiff has failed to prove its damages to a sufficient degree of certainty, and that the loan documents are unenforceable because they are unconscionable. (ECF No. 19, Defs.' Resp.) Plaintiff filed a timely Reply on January 26, 2018. (ECF No. 21, Pl.'s Reply.)

The Court held a hearing on Plaintiff's Motion on February 7, 2018. After hearing and considering the parties' arguments, the Court ruled from the bench on the issue of unconscionability, rejecting Defendants' argument that the loan documents were procedurally and substantively unconscionable, and thus unenforceable on that basis. The Court then took the issue of damages under advisement, and now issues the following ruling.

## II.    LEGAL STANDARDS

Summary judgment is appropriate where the moving party demonstrates that there is no genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). "A fact is 'material' for purposes of a motion for summary judgment where proof of that fact 'would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties.'" *Dekarske v. Fed. Exp. Corp.*, 294 F.R.D. 68, 77 (E.D. Mich. 2013) (Borman, J.) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

"In deciding a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party." *Perry v. Jaguar of Troy*, 353 F.3d 510, 513 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). At the same time, the non-movant must produce enough evidence to allow a reasonable jury to find in his or her favor by a preponderance of the evidence, *Anderson*, 477 U.S. at 252, and "[t]he 'mere possibility' of a factual dispute does not suffice to create a triable case." *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 576 (6th Cir. 2004) (quoting *Gregg v. Allen–Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). Instead, "the non-moving party must be able

to show sufficient probative evidence [that] would permit a finding in [his] favor on more than mere speculation, conjecture, or fantasy." *Arendale v. City of Memphis*, 519 F.3d 587, 601 (6th Cir. 2008) (quoting *Lewis v. Philip Morris Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). "The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. The plaintiff must present more than a mere scintilla of the evidence. To support his or her position, he or she must present evidence on which the trier of fact could find for the plaintiff." *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000) (internal quotation marks and citations omitted). That evidence must be capable of presentation in a form that would be admissible at trial. *See Alexander v. CareSource*, 576 F.3d 551, 558–59 (6th Cir. 2009).

## III.    DISCUSSION

Plaintiff's argument is that Defendants admit to signing the Note and the Guaranty (*see* Answer ¶¶ 7, 9), and they also admit that they have not paid the amount that Plaintiff demanded (*see id.* ¶¶ 11-13), so it follows that Plaintiff is entitled to judgment under the Note, the Guaranty, and the Security Agreement. As noted, Defendants counter on two fronts, arguing first that Plaintiff has not offered sufficient proof of damages, and then that the loan documents are invalid because they are unconscionable under Michigan law. The Court rejected the latter argument in a bench ruling as stated on the record at the February 7, 2018 hearing. For the

reasons below, the Court finds that the former argument lacks merit as well, and will therefore grant summary judgment to Plaintiff as to Counts I and II of the Complaint.

## A. Proof of Damages

Plaintiff's sole evidence of damages is the Affidavit of Joan Wane. As noted above, based on her "involve[ment] as a Senior Asset Manager of PNC's Asset Resolution Team with the administration of the Bank's loan relationship with the Defendants" (Wane Aff. ¶ 2), as well as her "familiar[ity] with the Bank's books and records pertaining to its loan relationship with the Defendants" (*id.* ¶ 3), Wane attests to the following facts:

> 4. MB Wholesale, Inc. has failed to pay the outstanding indebtedness in full at maturity as required pursuant to the Note.
> 5. Abed Mehanna has failed to pay all outstanding amounts owed by MB Wholesale, Inc. pursuant to the terms of his Guaranty.
> 6. As of November 17, 2017, the total amount of $1,143,519.71 is due and owing to the Bank, comprised of the principal balance of $1,095,824.05, accrued interest of $33,117.69, and late charges of $842.97 and legal fees of $13,735.00. Interest continues to accrue on the outstanding balance owed in the amount of $122.75 per day.

(Wane Aff. ¶¶ 4-6.)

Defendants contend that Wane's deposition testimony fatally undermines Plaintiff's evidence of damages because it demonstrates Wane's lack of independent knowledge of how the damages were calculated, what method was used, how sound that method was, or whether the results were correct. In fact, Defendants argue, Wane's testimony as PNC's designated corporate representative established that

19

"PNC was so unfamiliar with the only document supporting its damage claim that it could not even determine what the Payment History represented was due, let alone the method used to calculate it, or whether it matched the amount claimed in PNC's complaint." (Defs.' Mot. at 10, Pg ID 281.) This, Defendants conclude, should preclude Plaintiff from "from introducing any evidence beyond this complete lack of knowledge at trial or in support of a summary judgment motion. It is therefore impossible for PNC to prove its damages. The Defendants request that the Court dismiss this case as a result." (*Id.*)

Plaintiff characterizes the above contention by Defendants as an "absurd argument that a badgering discovery deposition transcript by Defendants['] counsel in which he fails to ever contest the amount of the loan or the payments received or lack thereof" should allow Defendants to withstand summary judgment. (Pl.'s Reply at 1, Pg ID 546.) Beyond that, Plaintiff relies on the fact that Defendants have admitted to signing the contracts and to not repaying the debt in full, and cites decisions in which state and federal courts in Michigan have "routinely granted summary judgment in favor of a creditor . . . where the debtor or guarantor cannot demonstrate a material fact as to liability, the amount owed, or validity of the underlying agreements." (*Id.* at 7, Pg ID 552.) *See*, *e.g.*, *Comerica Bank v. Berman*, No. 10- 12952, 2011 WL 2144538, at *2 (E.D. Mich. May 31, 2011) (Borman, J.) (granting summary judgment to a plaintiff lender because the defendant borrower

admitted he had not repaid his debt and because the lender's affidavit of damages was uncontroverted, thus establishing the absence of genuine issues of material fact as to both liability and damages).

In arguing that Wane's testimony destroys Plaintiff's case, Defendants rely on various federal district court decisions indicating that Federal Rule of Civil Procedure 30(b)(6) obligates a corporate party to designate a deponent who can knowledgeably testify on behalf of the corporation, such that the deponent's failure to do so precludes any reliance on evidence that is inconsistent with that testimony. None of Defendants' cited cases are precedential, but the proposition is supported by some District Courts within the Sixth Circuit. *See*, *e.g.*, *Consol. Rail Corp. v. Grand Trunk W. R. Co.*, 853 F. Supp. 2d 666, 670 (E.D. Mich. 2012) ("[I]f a party designates someone to testify on that party's behalf on the issue of evidence possessed by the party to support its claims or defenses, and the witness either disclaims any knowledge of such evidence or provides a limited amount of testimony on the subject, the organization may not use any evidence beyond that at trial (unless, of course, it has provided it in another way such as through initial disclosures or discovery responses and the testimony at the 30(b)(6) deposition is not inconsistent with those other disclosures).") (alteration in original) (internal quotation marks omitted) (quoting *Prosonic Corp. v. Stafford*, No. 07–cv–0803, 2008 WL 2323528, at *3 (S.D. Ohio June 2, 2008)).

For two critical reasons, however, this principle is not availing to Defendants here. First, Defendants have not shown that Wane's testimony is in fact inconsistent with the amount she averred Defendants owed in her Affidavit. There is not, for example, any indication in Wane's testimony that she had any reason to believe that the figures she was given had been calculated incorrectly, that such figures had been incorrect before, or that there was any other basis for claiming that any component of the final total should have been higher or lower. At most, Wane's testimony demonstrated an unfamiliarity on her part with the way in which the calculations were made (and then displayed on the Payment History). But this does not amount to inconsistent or contradictory evidence, and there is Sixth Circuit authority for the proposition that such a lack of knowledge on the part of an affiant in Wane's position does not raise a genuine issue of material fact regarding financial computations— particularly where the adverse party has failed to show why the calculations may be wrong. *See Fed. Deposit Ins. Corp. v. Armstrong*, 784 F.2d 741, 745–46 (6th Cir. 1986) ("[The defendant] alleges that the affidavits computing interest submitted by the [plaintiff] were improper because the affiant had not made the original computations. The calculation of interest is a mechanical task, and a knowledge of the computations is not tied to the person who made them in the same way as more personal experiences are. [The defendant] has not raised any specific question as to the amount of the judgment, so summary disposition was appropriate.").

Even more significant is the fact that Defendants, having admitted to signing the contracts and to not meeting Plaintiff's payment demand, have not submitted any competing evidence that would in any way contradict the amounts stated in Wane's Affidavit. A party opposing summary judgment "must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (quoting *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993)). "The mere existence of a scintilla of evidence in support of the nonmovant's position will not suffice to avoid summary judgment." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Wane's deposition testimony establishes that, pursuant to her typical practice, she requested a statement indicating what Defendants owed, which was drawn from Plaintiff's database by employees in a different division of the company and sent to her. The figures in that record then formed the basis of her Affidavit, which in turn is Plaintiff's evidence of damages. That evidence is not superabundant, but Defendants must provide "more than a mere scintilla" of evidence in support of their position. *Davis v. McCourt*, 226 F.3d 506, 511 (6th Cir. 2000). Notwithstanding Wane's designation as Plaintiff's Rule 30(b)(6) deponent, Defendants' failure to do more than cast doubt on her understanding of the record that Plaintiff turned over in discovery in support of their damages calculus is not "evidence of evidentiary quality that demonstrates the existence of a genuine issue

of material fact." *Perry v. Jaguar of Troy*, 353 F.3d 510, 516 (6th Cir. 2003).

This conclusion is further supported by Sixth Circuit authority establishing that even a conclusory affidavit of a lender's employee stating the amount owed can justify summary judgment for the lender if it is made on personal knowledge of the employee, and if the adverse party provides "no other evidence pertaining to the existence or the amount of the deficiency." *Abrams v. Fed. Deposit Ins. Corp.*, 944 F.2d 307, 312 (6th Cir. 1991). *Abrams* involved a conversion claim against the Federal Deposit Insurance Corporation ("**FDIC**") that hinged on whether the FDIC had the legal right to seize the plaintiff's savings account; to obtain summary judgment, the FDIC had to show that "(a) [the plaintiff] had an outstanding liability . . . at the time his account was seized, and (b) that the amount of that liability equalled or exceeded the amount seized from his account." *Id.* at 311. The FDIC's evidence was an affidavit identifying the promissory note and the contract from which the deficiency arose, and stating the amount owed with no further support. Under Sixth Circuit precedent, the court held, this evidence would justify summary judgment for the FDIC absent any competing evidence from the plaintiff:

> This single conclusory phrase, unsupported by any attached Bank records and without any explanation of how the amount owed was derived, is the only evidence ever offered by the FDIC to establish the existence and amount of the alleged deficiency.
> Skimpy as it is, this affidavit is based upon personal knowledge of the affiant and is sufficient under [Rule 56] to meet the moving party's burden to show there is no genuine issue of material fact regarding the

existence and the amount of the deficiency. If [the] affidavit were unrefuted, and if [plaintiff] offered no other evidence pertaining to the existence or the amount of the deficiency, there would be no evidence sufficient to permit a rational jury to find that the FDIC did not have a legal right to seize Abrams's account, and therefore was liable for conversion. [*See Anderson*, 477 U.S. at 248.] *See also Federal Deposit Insurance Corporation v. Armstrong*, 784 F.2d 741, 745 (6th Cir.1986) (unrefuted FDIC employee affidavits sufficient to support grant of summary judgment for FDIC); *Federal Deposit Insurance Corp. v. Investors Associates X., Ltd.*, 775 F.2d 152, 156 (6th Cir.1985) (same).

*Id.* at 312. The court went on to find that the plaintiff's competing evidence—his own affidavit giving a different account of what he had owed, and an argument that the bank's record actually supported that account—was ultimately enough for the plaintiff to avoid summary judgment. But the underlying principle in *Abrams* is clear: an affidavit on personal knowledge by an employee of the lender that states the amount of the deficiency meets the lender's initial summary judgment burden, and if the non-moving party does not offer *some* evidence "pertaining to the existence or the amount of the deficiency," *id.*, then summary judgment is warranted.

That principle controls this case. Plaintiff's evidence is nearly as meager as the evidence discussed in *Abrams*, and Defendants have cast some doubt on Wane's familiarity with the process by which records like the Payment History are generated. But Defendants' failure to adduce any evidence in response to Wane's Affidavit fatally undercuts their argument that Plaintiff cannot prove damages.

Defendants have conceded that they signed the loan documents and then failed to pay their obligations under those documents. Defendants have also failed to submit evidence from which a reasonable jury could conclude that Defendants are liable to Plaintiff for the loan principal, interest, or late charges in amounts different from those which Plaintiff has evidenced. Under these circumstances, Plaintiff is entitled to summary judgment.

## B.     Unconscionability

As noted *supra*, Defendants have also argued that the loan documents are unenforceable because the harshness of the terms therein render the agreements unconscionable under Michigan law. In accordance with its ruling from the bench on February 7, 2018, the Court finds that this argument lacks merit. As the late Yale Law School Professor Arthur Allen Leff has explained,

> substantially all of the important provisions in a normal sales contract are *potentially* exceedingly harsh. Generally they are inserted to determine who will stand a loss, perhaps a total loss, if a particular happening happens, or at least to give a huge litigation advantage to one of the parties should the question come up. . . . But the hallmark of unconscionability cannot be the harshness of the result without more, because sales clauses are designed to be harsh. Unless one says that *all* losses should be split or spread (as has been suggested in special contexts), a harsh result without more, even if the result of an adhesion or form-contract provision, cannot identify the impermissible.

Arthur Allen Leff, *Unconscionability and the Code—the Emperor's New Clause*, 115 U. Pa. L. Rev. 485, 540 (1967) (emphasis in original) (citations omitted). As

this Court is not persuaded that the loan documents should be deemed unenforceable on the basis of unconscionability, Plaintiff's Motion will not be denied on that basis.

## C. Attorneys' Fees

For the reasons discussed above, the Court finds that Plaintiff's entitlement to summary judgment as to Defendants' liability under the Loan Agreement and the Guaranty is not undermined by any failure on Plaintiff's part to sufficiently prove its damages. Yet even as Wane's Affidavit amounts to competent evidence of the principal, interest, and late fees owed, it is not sufficient to justify an award of the "legal fees of $13,735.00" attested to by Wane. (Wane Aff. ¶ 6.)

"In a diversity action such as this, when considering an award of attorney's fees, the Court must apply state substantive law and federal procedural law." *Hunt v. Hadden*, 159 F. Supp. 3d 800, 805 (E.D. Mich.) (citing *First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 528 (6th Cir. 2002)), *aff'd*, 665 F. App'x 435 (6th Cir. 2016). Under Michigan substantive law, "the parties to an agreement may include within the agreement a provision respecting the payment of attorney fees, which courts will enforce like any other term unless contrary to public policy." *Pransky v. Falcon Grp., Inc.*, 311 Mich. App. 164, 194 (2015) (citing *Fleet Business Credit, LLC v. Krapohl Ford Lincoln Mercury Co.*, 274 Mich. App. 584, 589 (2007)). As a procedural matter, Federal Rule of Civil Procedure 54(d) "states that requests for attorney's fees must be made by motion, which must 'specify the

judgment and the statute, rule, or other grounds entitling the movant to the award.'" *Hunt*, 159 F. Supp. 3d at 805 (quoting Fed. R. Civ. P. 54(d)(2)(B)(ii)). Even if the Court were to deem Plaintiff as having satisfied this requirement by requesting attorneys' fees pursuant to the Loan Agreement—which provides for MB Wholesale's reimbursement of Plaintiff's "reasonable fees and expenses of counsel" (Loan Agreement at 7, Pg ID 226)—more is required, as a matter of procedure, for the award of fees Plaintiff seeks. *See Bodenhamer Bldg. Corp. v. Architectural Research Corp.*, 989 F.2d 213, 221 (6th Cir. 1993) (observing in a diversity action that "[g]enerally, an inquiry into the reasonableness of attorneys' fees involves a determination of the suitability of the number of hours expended and an analysis of the propriety of the hourly fee charged") (citing *Hensley v. Eckerhart*, 461 U.S. 424 (1983)). Absent some basis on which this Court may assess the reasonableness of the fees sought by Plaintiff, an award of such fees is not appropriate at this time.

## IV.     CONCLUSION

There is no genuine issue of material fact regarding Defendants' execution of the Loan Agreement and the Guaranty, or regarding Defendants' failure to repay the loan owed to Plaintiff as agreed when such repayment was due at the loan's maturity. Further, for the reasons stated above, the Court finds that the loan documents are not unconscionable, and that Plaintiff has not failed to prove damages (with the exception of attorneys' fees) in a way that disentitles Plaintiff to summary judgment.

Defendant MB Wholesale is liable to Plaintiff on the Loan Agreement, and Defendant Mehanna is liable to Plaintiff on the Guaranty. "However, because of the lapse of time between the motion filing and this decision, and the inevitable accrual of interest on the defaulted loan debts, updated information on the amounts owing currently will be needed before judgment can enter." *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co., Inc.*, 140 F. Supp. 3d 623, 637 (E.D. Mich. 2015).

Accordingly, it is ORDERED that Plaintiff's Motion for Partial Summary Judgment as to Counts I and II of the Complaint (ECF No. 16) is GRANTED.

It is further ORDERED that Plaintiff must submit an affidavit stating the amounts currently owing under the loan obligations described in its summary judgment motion. The affidavit must be submitted no later than **August 13, 2018**, should fix the amount owed as of **August 20, 2018**, and may include a calculation of attorneys' fees. If any party disputes the amount claimed in Plaintiff's affidavit, that party must file a counter-affidavit detailing the basis of its disagreement **on or before August 17, 2018**.

IT IS SO ORDERED.

Dated:  August 3, 2018                                   s/Paul D. Borman
                                                        Paul D. Borman
                                                        United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 3, 2018.

s/D. Tofil
Deborah Tofil, Case Manager